IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

JEFF L. WHITE,

        Plaintiff,

vs.                                                                 No.  03cv0543 DJS

JO ANNE B. BARNHART,
COMMISSIONER OF SOCIAL SECURITY,

        Defendant.

## MEMORANDUM OPINION

This matter is before the Court on Plaintiff's (White's) Motion to Reverse and Remand for Payment of Benefits, or in the Alternative, for a Rehearing **[Doc. No. 13]**, filed October 20, 2003, and fully briefed on December 22, 2003.  On March 18, 2002, the Commissioner of Social Security issued a final decision denying White's application for disability insurance benefits and supplemental security income benefits.   Having considered the arguments, pleadings, administrative record, relevant law, and being otherwise fully informed, the Court finds the motion to reverse is not well taken and will be DENIED.

### I.  Factual and Procedural Background

White, now forty-three years old (D.O.B. June 6, 1961), filed his application for disability insurance benefits and supplemental security income on March 4, 1994, alleging disability since January 1, 1994, due to knee problems, back pain, high blood pressure, aching bones, seizures, and a bleeding ulcer.  Tr. 15.  White has a high school education, twenty-five (25) months training and technical instruction, is ASE certified, and has past relevant work as a cook, truck driver,

roughneck, and body shop frameman. Tr. 19, 59, 591. On August 5, 1995, the Commissioner's Administrative Law Judge (ALJ) denied benefits. Tr. 14-25. Thereafter, White filed a Request for Review of the decision by the Appeals Council. After the Appeals Council declined the request for review, White appealed to the district court. Tr. 3. On March 26, 1997, the Honorable James A. Parker remanded the case to the ALJ for further proceedings. Tr. 216.

On May 28, 1998, after a supplemental hearing before a different ALJ, the ALJ denied benefits. Tr. 548-553. The ALJ found White retained the residual functional capacity (RFC) for light work limited by a requirement of no sitting for more than thirty minutes at one time and no standing for more than an hour at a time. Tr. 551. The ALJ also found White had to work in a clean environment and avoid unprotected heights and dangerous work conditions. *Id.* The ALJ also noted White would have difficulty dealing with the public and social situations. *Id.* Again, White filed a Request for Review of the decision by the Appeals Council. On February 27, 1999, the Appeals Council remanded the case back to the ALJ on the grounds that the ALJ had not complied with Judge Parker's March 26, 1997 Order. The Appeals Council directed the ALJ to provide White with a hearing and obtain testimony from a vocational expert.

On October 21, 1999, after a supplemental hearing, the same ALJ denied benefits. Tr. 619-634. The ALJ found White "would not be disabled if he stopped using drugs and alcohol." Tr. 633. White filed a Request for Review of the ALJ's decision by the Appeals Council. Tr. 674. On February 26, 2001, the Appeals Council remanded the case, specifically directing "that, upon remand, the case be assigned to a different ALJ." Tr. 677. The Appeals Council Remand Order directed the ALJ to hold another supplemental hearing, "delineate the claimant's residual functional capacity during the entire period at issue; obtain supplemental testimony from a

2

vocational expert in response to proper hypothetical questions reflecting the claimant's specific capacity/limitations established by the record as a whole; and issue a new decision." *Id.*

On December 12, 2001, a new ALJ held a supplemental hearing. Tr. 181-215. On March 18, 2002, the ALJ issued a new decision and denied benefits. Tr. 151-162. The ALJ found White suffered from severe impairments consisting of epilepsy, joint pain, post-traumatic stress disorder, and an alcohol addiction disorder. Tr. 154. The ALJ further found White suffered from "alleged chest pain," hypertension, epigastric pain, asthma, and recurrent depression. *Id.* However, the ALJ did not find these impairments to be severe. *Id.* After reviewing the medical evidence, the ALJ concluded White retained the following RFC:

> I find that the claimant has retained a residual functional capacity for simple work with one- to two-step repetitive work tasks. I find that the claimant has a residual functional capacity to perform light work that allows a sit-stand option on an occasional basis during a regular eight-hour workday. I also find that the claimant cannot work at heights, around dangerous moving machinery, or around open fires or chemicals because of his seizure disorder.

Tr. 159. Based on this RFC, the ALJ found White could not perform his past relevant work. Therefore, the ALJ consulted with a vocational expert (VE). The VE testified that "assuming the claimant's specific work restrictions he was and is capable of making a vocational adjustment to the job of a Laundry Folder/Spotter." Tr. 180. The VE also testified that White was capable of performing the job of Rental Clerk, a light, unskilled job.

White filed a Request for Review of the ALJ's decision by the Appeals Council. Tr. 144. On March 31, 2003, the Appeals Council denied White's request for review of the ALJ's decision. Hence, the decision of the ALJ became the final decision of the Commissioner for judicial review purposes. White seeks judicial review of the Commissioner's final decision pursuant to 42 U.S.C. § 405(g).

## II.  Standard of Review

The standard of review in this Social Security appeal is whether the Commissioner's final decision is supported by substantial evidence and whether he applied correct legal standards. *Hamilton v. Secretary of Health and Human Services,* 961 F.2d 1495, 1497-98 (10th Cir. 1992). Substantial evidence is more than a mere scintilla and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Glass v. Shalala*, 43 F.3d 1392, 1395 (10th Cir. 1994).  "Evidence is not substantial if it is overwhelmed by other evidence in the record or constitutes mere conclusion."  *Musgrave v. Sullivan*, 966 F.2d 1371, 1374 (10th Cir. 1992). Moreover, "all of the ALJ's required findings must be supported by substantial evidence," *Haddock v. Apfel,* 196 F.3d 1084, 1088 (10th Cir. 1999), and all of the relevant medical evidence of record must be considered in making those findings, *see Barker v. Bowen*, 886 F.2d 289, 291 (10th Cir. 1989).  "[I]n addition to discussing the evidence supporting his decision, the ALJ must discuss the uncontroverted evidence he chooses not to rely upon, as well as significantly probative evidence he rejects."  *Clifton v. Chater*, 79 F.3d 1007, 1010 (10th Cir. 1996).  Therefore, while the Court does not reweigh the evidence or try the issues de novo, *see Sisco v. United States Dep't of Health & Human Servs.*, 10 F.3d 739, 741 (10th Cir. 1993), the Court must meticulously examine the record as a whole, including anything that may undercut or detract from the ALJ's findings, in order to determine if the substantiality test has been met.  *See Washington v. Shalala*, 37 F.3d 1437, 1439 (10th Cir. 1994).

### III.  Discussion

In order to qualify for disability insurance benefits or supplemental security income, a claimant must establish a severe physical or mental impairment expected to result in death or last for a continuous period of twelve months which prevents the claimant from engaging in substantial gainful activity.  *Thompson v. Sullivan*, 987 F.2d 1482, 1486 (10th Cir. 1993)(citing 42 U.S.C. §423(d)(1)(A)).  The regulations of the Social Security Administration require the Commissioner to evaluate five factors in a specific sequence in analyzing disability applications.  20 C.F.R. § 404.1520 (a-f).  The sequential evaluation process ends if, at any step, the Commissioner finds the claimant is not disabled.  *Thompson v. Sullivan*,  987 F.2d at 1487.

At the first four levels of the sequential evaluation process, the claimant must show he is not engaged in substantial gainful employment, he has an impairment or combination of impairments severe enough to limit his ability to do basic work activities, and his impairment meets or equals one of the presumptively disabling impairments listed in the regulations under 20 C.F.R. Part 404, Subpt. P, App. 1, or he is unable to perform work he had done in the past.  20 C.F.R. §§ 404.1520 and 416.920.  At the fifth step of the evaluation, the burden of proof shifts to the Commissioner to show the claimant is able to perform other substantial gainful activity considering his residual functional capacity, age, education, and prior work experience. *Id.*

In support of his motion to reverse and remand, White makes the following arguments: (1) the ALJ's mental RFC assessment is not supported by substantial evidence; and (2) the ALJ's

finding at the fifth step of the sequential evaluation process is not supported by substantial evidence.[1]

### A.  RFC Determination

Residual functional capacity is defined as "the maximum degree to which the individual retains the capacity for sustained performance of the physical-mental requirement of jobs."  20 C.F.R. Pt. 404, Subpt. P, App. 2, § 200.00(c).  In arriving at an RFC, agency rulings require an ALJ to provide a "narrative discussion describing how the evidence supports" his or her conclusion.  See SSR 96-8p, 1996 WL 374184, at *7.  The ALJ must "discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis . . . and describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record."  *Id.*  The ALJ must also explain how "any material inconsistencies or ambiguities in the case record were considered and resolved."  *Id.*  "The RFC assessment must include a discussion of why reported symptom-related functional limitations and restrictions can or cannot reasonably be accepted as consistent with the medical or other evidence."  *Id.*

White objects to the ALJ's reliance on the "opinion of the nonexamining state agency doctor for his RFC findings for the mental impairment."  Pl.'s Mem. Br. in Supp. at 5.  According to White, the ALJ "inexplicably" converted the state agency physician's opinion that he could

---

[1] In her response to White's motion to reverse and remand, the Commissioner cites to *Murrell v. Shalala*, 43 F.3d 1388, 1389 n.2 (10th Cir. 1994) and two other cases, for the proposition that issues raised in a perfunctory manner and not supported by argument are deemed waived.  Def.'s Resp. at 2.  The Court agrees.  Although, the Court will address the issues raised in White's motion, in the future, counsel for White must make an effort to develop arguments in support of the issues raised in his motion or they will be considered waived.

perform "low stress, non-public work" into the ability to perform "simple work with one-to two-step work tasks." *Id.* Citing to *Social Security Ruling* 96-6p, and *Drapeau v. Massanari*, 244 F.3d 1211 (10th Cir. 2001), White contends the ALJ erred in relying on Dr. Leroy Gabaldon's opinion because Dr. Gabaldon, a state agency nonexamining psychologist, "did not have the benefit of the medical records in the transcript at pages 410-17, 434-37, 440-471, 581-598, and 702-777." Pl.'s Mem. Br. in Supp. at 5.

Social Security Ruling 96-6p provides in pertinent part:

POLICY INTERPRETATION: Because State agency medical and psychological consultants and other program physicians and psychologists are experts in the Social Security disability programs, the rules in 20 C.F.R. 404.1527(f) and 416.917(f) require administrative law judges and the Appeals Council to consider their findings of fact about the nature and severity of an individual's impairment (s) as opinions of nonexamining physicians and psychologists.  Administrative law judges and the Appeals Council are not bound by findings made by State agency or other program physicians and psychologists, but they may not ignore these opinions and must explain the weight given to the opinions in their decisions.

Paragraphs 404.1527(f) and 416.927(f) provide that the rules for considering medical and other opinions of treating sources and other sources in paragraphs (a) through (e) also apply when we consider the medical opinions of nonexamining sources, including State agency medical and psychological consultants and other program physicians and psychologists.  The regulations provide progressively more rigorous tests for weighing opinions as the ties between the source of the opinion and the individual become weaker.  For example, the opinions of physicians or psychologists who do not have a treatment relationship with the individual are weighed by stricter standards, based to a greater degree on medical evidence, qualifications, and explanations for the opinions, than are required of treating sources.

For this reason, <u>the opinions of State agency medical and psychological consultants and other program physicians and psychologists can be given weight only insofar as they are **supported by evidence in the case record**</u>, <u>considering such factors as the supportability of the opinion in the evidence **including any evidence received at the administrative law judge and Appeals Council levels that was not before the State agency,** the consistency of the opinion with the record as a whole, including other medical opinions, and any explanation for the opinion provided by the State agency medical or psychological consultant or other program physician or</u>

> psychologist. The adjudicator must also consider all other factors that could have a bearing on the weight to which an opinion is entitled, including any specialization of the State agency medical or psychological consultant.

See SSR 96-6p, 1996 WL 374180, *2 (1996)(emphasis added).  Social Security Ruling 96-6p makes clear that an ALJ may adopt a State agency consultant's opinion and that opinion will stand if it is "supported by evidence in the case record."  In determining whether Dr. Gabaldon's opinion is "supported by the evidence in the case record," the Court must consider the record as a whole, including "any evidence received at the administrative law judge and Appeals Council levels that was not before the State agency."  Id.

In this case, White argues that the ALJ erred when he relied on Dr. Gabaldon's opinion to determine his mental RFC because Dr. Gabaldon did not have the benefit of Dr. Clifford O. Morgan's Psychological evaluation (Tr. 410-417), Dr. Morgan's and Dr. Paula Hughson's Medical Assessment of Ability To Do Work-Related Activities (Mental) (Tr 434-437), medical records from Valencia Counseling Services for the period of September 1995 through January 1998 (Tr. 440-471), records from Valencia Counseling Center for 1998 (Tr. 581-598), and medical records from Valencia Counseling Services for the period of February 4, 1999 through April 26, 2001 (Tr. 702-777).  However, White's counsel falls short of his role as advocate for his client.  Counsel cites to over 130 pages of evidence but fails to address how this evidence supports his statement that the ALJ erred in "relying" on Dr. Gabaldon's opinion to determine White's mental RFC.  The mere fact that this evidence was not before Dr. Gabaldon does not lead to the conclusion that the ALJ erred in **concurring** with Dr. Gabaldon's opinion regarding the claimant's functional limitations due to his PTSD.

Moreover, the ALJ did not determine White's mental RFC solely on Dr. Gabaldon's opinion. The ALJ's decision regarding White's mental RFC states:

> In addition to musculoskeletal impairments, the claimant alleged disability due to PTSD and alcohol use. The record evidence shows that the claimant attended mental health counseling at "Valencia Counseling Services" (Valencia) from 1994 until October 1998 (Exhibits 43, 55 and 66). These treatment notes indicate that the claimant experienced medical improvement with medication (Exhibit 46). In March 1997, Dr. Paula Hughson, a consulting psychiatrist, reported that the claimant was responding "quite well" to psychotherapy (Exhibit 44, p.6). Morever, my review of these counseling records shows that the claimant was primarily concerned with obtaining social security benefits, rather than receiving mental health therapy (Exhibit 55).
>
> As noted above, Dr. Hughson conducted a consultative psychiatric evaluation in March 1997. The claimant informed Dr. Hughson that he had last worked in 1993 (Exhibit 44, p1). However, as stated above, the claimant continued to work until at least 1994. In addition, the claimant reported that, despite taking Prozac, he had feelings of depression, nightmares, and paranoia. He told Dr. Hughson that he was drinking about 12 beers a week. Dr. Hughson assessed a chronic and delayed PTSD and a long history of polysubstance use, currently in partial remission. Dr. Hughson did not diagnose depression. Although Dr. Hughson reported that the claimant had a global assessment of functioning (GAF) score consistent with a "serious" impairment, I note that this was based on a one-time examination of the claimant. Therefore, this GAF score does not reflect the claimant's functioning over an extended time period. Consequently, I do not credit Dr. Hughson's estimate of the claimant's overall functioning. Moreover, Dr. Hughson did not find that the claimant's PTSD or alcohol use precluded him from performing simple, unskilled work (Exhibit 44).
>
> Subsequently, in April 1997, a state agency doctor (Dr. Gabaldon), who had reviewed the medical record to date, determined the claimant had a "severe" anxiety-related disorder which was related to his alcohol use. This doctor also determined that the claimant had "moderate" difficulties in social functioning, and he had only "mild" restrictions in his daily living activities and his ability to concentrate (Exhibit 45). Moreover, this doctor determined that the claimant could perform low-stress, non-public work despite his diagnoses of PTSD and an alcohol abuse disorder (Exhibit 46). **I concur with this doctor's opinion regarding the claimant's functional limitations due to his PTSD.**
>
> In August 1997, Dr. C. Morgan conducted a psychological evaluation, noting that the claimant was still taking Prozac. The claimant also told Dr. Morgan that he was drinking only about 12 beers per week. Dr. Morgan administered the WAIS-R test to the claimant which revealed he had a verbal I.Q. score of 90: a performance I.Q. score of 99; and full scale I.Q. score of 93. According to Dr. Morgan, the claimant had "average" intelligence. Dr. Morgan concluded that the claimant had PTSD, a learning disability (not otherwise specified), and alcohol abuse in partial remission. Dr. Morgan also found that the claimant had a GAF score of "70," which means he had "some mild" symptoms or "some difficulty" in occupational and social functioning (Exhibit 48).

9

>I am aware that Dr. Morgan completed a work assessment form in February 1998. In this form, he reported that the claimant had a "poor" ability to deal with work stresses and demonstrate reliability. But, he found that the claimant had a "mild" impairment regarding his ability to think and focus (Exhibit 53). Dr. Morgan's findings on this form are not consistent with his earlier report that the claimant had only "mild" limitations in his occupational and social functioning. Furthermore, I note that Dr. Morgan did not state in either report that the claimant's psychological disorders precluded him from performing substantial gainful activity.
>
>Additionally, I note that in October 1997, Dr. Powers reported that the claimant was alert, attentive, and able to follow directions as well; he was oriented to the day and dates; and, he could recall two out of three items after a three-minute delay. Further, Dr. Powers stated that the claimant's speech was "clearly articulated" (Exhibit 49). In April 1999, the claimant told Dr. Powers that he was not taking Prozac for his "depression." However, the claimant did not provide any explanation for his failure to follow prescribed medical treatment (Exhibit 67).
>
>I have reviewed the counseling notes for 1998 from "Valencia." This documentation shows that the claimant was drinking only one or two beers twice a week (Exhibit 66). In March 2000, the claimant reportedly told a counselor that "daily drinking" was not a problem and was not causing him and "trouble." This counselor thought that he had "denial about using alcohol to cope with his fears" (Exhibit 78,pp. 52 and 54). I resolve doubts in the claimant's favor and find that he has not had a "disabling" alcohol addiction disorder during relevant times. It is noted, however, that the claimant's drinking may well have complicated the ability of the various doctors to correctly analyze and effectively trat the claimant.

Tr. 157-159 (emphasis added). It is clear from the ALJ's decision that he considered all the relevant evidence in determining White's mental RFC. Additionally, White does not challenge the ALJ's findings as to the other mental health care providers' opinions cited in the ALJ's decision. Because White failed to set forth any evidence showing that Dr. Gabaldon's opinion regarding White's functional limitations due to his PTSD are not supported by substantial evidence, and the Court has found none, the Court finds that White's contention that the ALJ erred in "relying on Dr. Gabaldon's opinion" to determine his mental RFC is without merit. Accordingly, the Court finds that the ALJ did not err in concurring with Dr. Gabaldon's opinion regarding his functional limitations due to his PTSD. The Court further finds that the ALJ determined White's mental RFC based on the record as a whole, and it is supported by substantial evidence.

10

### B.  Step Five of the Sequential Evaluation Process

At step five of the sequential evaluation process, the Commissioner bears the burden of proving by substantial evidence that the claimant retains the RFC to perform work at some level lower than his/her past relevant work.  *Thompson,* 987 F.2d at 1491.  White contends that "the ALJ's step five finding is not supported by substantial evidence."  Pl.'s Mem. Br. at 6.  In support of this contention, White claims the ALJ found he had no transferable skills yet accepted the VE's testimony that he could perform the occupation of laundry folder/spotter and rental clerk, occupations with reasoning levels of 3.  White cites to the DOT, Appendix C, Scale of General Education Development (GED) in support of his argument.  Additionally, White contends the VE testified the laundry folder/spotter occupation was unskilled when in fact that occupation is semiskilled with a specific vocational preparation of 3.  Accordingly, White argues that the occupations identified by the VE are not available to him and a thus a remand is mandated.

The Commissioner correctly points out that White incorrectly equates his reasoning education level with the simplicity of the **tasks** involved in jobs enumerated by the VE.  The reasoning level of the enumerated jobs is the level of education necessary to **understand the job duties.**  The Dictionary of Occupational Titles (DOT) states in pertinent part:

III.  General Educational Development (GED)

General Educational Development embraces those aspects of education (formal and informal) which are required of the worker for satisfactory job performance.  This is education of a general nature which does not have a recognized, fairly specific occupational objective.  Ordinarily, such education is obtained in elementary school, high school, or college.  However, it may be obtained from experience and self-study.

The GED Scale is composed of three divisions: Reasoning Development, Mathematical Development, and Language Development.  The description of the various levels of language and mathematical development are based on the curricula taught in schools throughout the United States.  An analysis of mathematical courses in school criteria reveals distinct levels

> of progression in the primary and secondary grades and in college. These levels of progression facilitated the selection and assignment of six levels of GED for the mathematical development scale.
>
> However, though language courses follow a similar pattern of progression in primary and secondary school, particularly in learning and applying the principles of grammar, this pattern changes at the college level. The diversity of language courses offered at the college level precludes the establishment of distinct levels of language progression for these four years. Consequently, language development is limited to five defined levels of GED inasmuch as levels 5 and 6 share a common definition, even though they are distinct levels.

*See Dictionary of Occupational Titles*, Appendix C, III General Education Development, at 1009-12 (4th ed. revised 1991). Thus, claimants with a high school education can perform jobs at reasoning level 4 and those with a college education can perform at reasoning levels 5 or 6.

A reasoning level 3 indicates the ability to "apply commonsense understanding to carry out instructions furnished in written, oral, or diagrammatic form and deal with problems involving several concrete variables in or from standardized situations." *Id.* at 1011. White has a high school education and, according to Drs. Hughson and Morgan, has average intellectual functioning. Tr. 393, 415. Moreover, White's past work as an auto body framer and truck driver required a reasoning level of 3. *See* DOT No. 807.381-010 and DOT No. 906.683-022. Additionally, the ALJ specifically asked the VE whether the designated jobs could be performed with a specified limitation of "simple one- and two-step work tasks at the light exertional level." The ALJ asked the VE the following questions:

ALJ:   Okay. Let me add some additional limitations on this hypothetical. Hypothetical number two would indicate same as the above except that this individual is limited to simple one and two step processes. How does it affect the jobs that you've described starting with the auto parts, the rental clerk, the laundry folder?

VE:   The auto parts now because that's a semi-skilled job and requires that you shift from task to task. However, the one before, the laundry spotter job would remain and the rental clerk job would remain.

ALJ:  So it would eliminate the auto parts?

VE:   Yes.

ALJ:  But the others would remain?

VE:   Yes.

Tr. 209-210. Therefore, the ALJ inquired about White's ability to do the jobs presented by the ALJ. Moreover, the ALJ's RFC requiring simple work with one- to two-step repetitive work tasks comports with the opinions' of Dr. Morgan's psychological evaluation (Tr. 410-416) and Dr. Paula Hughson's Medical Assessment of Ability To Do Work-Related Activities (Mental). Dr. Morgan opined White's "attention and concentration were mildly affected" and his "ability to think and focus was also mildly impaired." Tr. 434-435. Dr. Hughson opined White was "probably slower to complete tasks than others" due to cognitive deficiencies. Tr. 438. Accordingly, the Court finds no conflict with the VE's testimony and the DOT on this basis.[2]

---

[2] Social Security Ruling 00-4p, 2000 WL 1898704, explains that "[w]hen a VE . . . provides evidence about the requirements of a job or occupation, the [ALJ] has an affirmative responsibility to ask about any possible conflict between that evidence and information provided in the DOT." *Id.* at 4. "If the VE's . . . evidence appears to conflict with the DOT, the [ALJ] will obtain a reasonable explanation for the apparent conflict." *Id.* In this case, the VE testified that White could perform the jobs of rental clerk, laundry folder/spotter. The VE also stated that the source of her information was the DOT. The ALJ also questioned the VE and sought clarification regarding White's ability to perform these jobs given his limitations. Accordingly, the ALJ met his "affirmative responsibility" to inquire about any possible conflict. *C.f. Gibbons v. Barnhart*, 85 Fed.Appx. 88, 93 (10th Cir. 2003).

White also contends that the occupation of laundry folder/spotter is semiskilled contrary to the VE's testimony that it was unskilled.  As the Commissioner counters, even assuming that White cannot perform this job, White can still perform the occupation of rental clerk.  The VE testified the rental clerk job comprised 341,000 positions nationally and 1,600 jobs in New Mexico.  The Tenth Circuit has found these numbers to represent a significant number of jobs in the economy to satisfy the ALJ's burden of proof.  *See Trimiar v. Sullivan*, 966 F.2d 1326, 1330-32 (10th Cir. 1988)(refusing to draw any bright line but finding 850-1000 potential jobs were a significant number of jobs).  Accordingly, the Court finds that the ALJ's finding at step five of the sequential evaluation process is supported by substantial evidence.

### C.  Conclusion

The Court's role is to review the record to ensure that the ALJ's decision is supported by substantial evidence and that the law has been properly applied.  After such review, the Court is satisfied that substantial evidence supports the ALJ's mental RFC determination and his finding of nondisability at step five.  Accordingly, the ALJ's decision is affirmed.

A judgment in accordance with this Memorandum Opinion will be entered.

_____
**DON J. SVET**
**UNITED STATES MAGISTRATE JUDGE**